NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SAMUEL NIEVES,<br><br>        Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>        Defendant. | Civil Action No.: 09-2884 (PGS)<br><br>**OPINION** |

**SHERIDAN, U.S.D.J.**

    This is an appeal brought pursuant to Section 405(g) of the Social Security Act, 42 U.S.C. § 405 (the "Act"), as amended. Plaintiff Samuel Nieves ("Plaintiff") seeks review of the final decision of the Commissioner of the Social Security Administration denying his claim for Disability Insurance Benefits and Supplemental Security Income Benefits for the period July 13, 1998 to May 16, 2005. The Commissioner of the Social Security Administration (the "Commissioner" or "Defendant") found that Plaintiff was only eligible for Supplemental Security Income Benefits as of May 17, 2005. For the following reasons, this matter is remanded to the Commissioner for further consideration in accordance with this opinion.

    **I.    BACKGROUND**

    Plaintiff is a 53-year old man born on July 29, 1956 in Puerto Rico. (R. at 31.) He moved from Puerto Rico when he was six months old and currently resides in Carteret, New Jersey. (*Id.*)

Plaintiff has a high school diploma and some college credits. (*Id.* at 101.) He was last employed on July 13, 1998 as a custodian for the United States Post Office, a job he held for approximately five years. (*Id.* at 31, 97.) As a custodian, Plaintiff performed mostly manual labor, moving furniture and removing snow from the premises, among other things. (*Id.* at 31-32.) However, Plaintiff was eventually fired due to excess absences, which were caused by court dates and his depression. (*Id.* at 48, 20.)

Prior to his Post Office employment, Plaintiff worked at Pomerantz Personnel for approximately ten years as a lab technician. (*Id.* at 33, 35.) In that capacity, Plaintiff performed "reformulat[ions]," which required him to stand for long periods during the day and lift and carry items weighing as much as 30 to 50 pounds. (*Id.* at 33-34.) Plaintiff's employment preceding Pomerantz Personnel is somewhat unclear. (*See id.* at 34-35.) But the record does indicate that Plaintiff served in the U.S. Navy from March of 1974 to February 1976 and received an honorable discharge. (*Id.* at 164.)[1]

In April 1996, while working for the Postal Service, Plaintiff was hospitalized for approximately three weeks at the University of Medicine and Dentistry of New Jersey ("UMDNJ") with a diagnosis of "major depression." (*Id.* at 157.) Generally, Plaintiff attributed his depression to marital and legal problems. (*Id.*) According to Plaintiff, he was anxious and angry about his pending divorce, the possibility of losing custody of his children, and the prospect of a jail sentence for hitting his wife and fighting. (*Id.*) To treat his anxiety, Plaintiff was prescribed 100 milligrams

---

[1] We thank Mr. Nieves for his service to our Country.

of Zoloft. (*Id.* at 157, 162.)[2]

On December 9, 1996 and December 26, 1996, Plaintiff returned to UMDNJ. (*Id.* at 157, 163.) According to Plaintiff's medical records, he again attributed his depression to marital and legal problems. (*Id.*) Plaintiff's mood was reported as irritable and his affect was angry. (*Id.* at 158.) Nonetheless, Plaintiff's depression was reported to have "improved significantly" since his prior hospital visit. (*Id.*) Moreover, his cognitive function and associative process were normal, his insight and judgment were fair, and his Global Assessment of Functioning ("GAF") rating was 65 (*id.* at 158) which indicates mild symptoms, but "generally functioning pretty well." *Harvey v. Nicholson*, 20 Vet. App. 132 (Table), 2005 WL 1503772, at *5 (Vet. App. 2005) (describing GAF Scale ranges).

From February 10, 1997 until September 23, 2004, Plaintiff neither sought nor received any mental treatment. (R. at 18.)[3] However, Plaintiff testified that he remained depressed and was homeless for a period of approximately six months during that time:

> Q:  Where did you go when you moved out?
>
> A:  I stay[ed] homeless. I used to stay under a bridge.
>
> Q:  And how long were you . . . homeless?
>
> A:  Approximately six months, because at that time I felt so down. It's like -- I always was a good person, whatever, intelligent and everything and I felt I'm not supposed to be in this situation. And just seeing my mother, because she knew I was a good kid growing up, went to school and everything, it just hurt me, because she sees

---

[2] Plaintiff received Zoloft during this hospitalization, but was not "maintained on" the drug until January 13, 1997. (*Id.* at 18.) His dosage eventually increased to 200 milligrams.

[3] The record indicates that Plaintiff may have received monthly psychotherapy services at Raritan Bay Mental Health Center until 1998. (*Id.* at 162.)

> me in that condition.
>
> \* \* \*
>
> Q:  You never went back to Raritan Bay? You didn't go back to UMDNJ at that time?
>
> A:  I don't think I did.
>
> Q:  What was your life like during that time? What were you doing when you lived with your mother during that time?
>
> A:  I was always fatigued, tired, didn't go no where, no friends, nothing, no interest. And today is the same. I live alone. I don't go anywhere.

(*Id.* at 42-43.)

Beginning in 1997, Plaintiff also began to experience dizziness, "tingling" sensations, and fainting spells due to a later discovered was a cardiovascular problem. (*Id.* at 37-38.) For instance, on December 31, 1997, Plaintiff passed out for two hours in the Post Office bathroom during work. Upon regaining consciousness, Plaintiff was admitted to JFK Medical Center in Edison, New Jersey. (*Id.* at 239.)[4]

On September 23, 2004, on the advice of his mother, Plaintiff sought mental health treatment at the Raritan Bay Mental Health Center. During his intake interview, Plaintiff reported having the following symptoms, which he asserted were present for "the past eight years": hypersomnia, difficulty falling asleep, interrupted sleep, crying, fatigue, loss of interest in usual activities, feelings of hopelessness, episodic anxiety, and irritability. (*Id.* at 174.) Again, Plaintiff blamed his condition on conflicts with his now-ex-wife and legal problems. (*Id.*) Edward Banasiak, Ph.D., the Principal

---

[4] According to Plaintiff, his supervisor suspended him for his two hour disappearance. (*Id.* at 37.)

Psychiatric Social Worker at Raritan Bay, diagnosed Plaintiff as having a major depressive disorder, recurrent, and noted "[h]is mood was moderately depressed." (*Id.* at 175.) Socially, Plaintiff "reported marginal contact with people, except for immediate family." (*Id.*) However, Dr. Banasiak also reported that Plaintiff's responses were "relevant and coherent" and his "[a]ffect was stable and appropriate to thought content." (*Id.*) Moreover, there was "no evidence of psychosis" and suicidal impulse was denied. (*Id.*) Although difficult to discern, Dr. Banasiak's periodic progress notes from October 12, 2004 through July 2005 further indicate that Plaintiff's depression continued, caused by legal and marital problems. (*Id.* at 168-73.)

In addition to his depression, in and around 2005, Plaintiff once again suffered fainting spells similar to the one he suffered while working at the Post Office in 1997. For instance, on May 3, 2005, Plaintiff lost consciousness while riding a bike and suffered facial abrasions and a possible nose fracture for which he was treated. (*Id.* at 140, 154.) On November 17, 2005, Plaintiff again passed out in the bathroom (this time at home), and was admitted to Raritan Bay Medical Center for further evauation. (*Id.* at 193.) And on December 21, 2005, Plaintiff passed out during a tilt-table test, intended to diagnose his condition, while at Robert Wood Johnson Medical Center. (*Id.* at 221, 239.) Eventually, on December 23, 2005, Plaintiff had a pacemaker implanted at Robert Wood Johnson, which Plaintiff testified prevented further fainting, although he still experiences dizziness and tingling sensations. (*Id.* at 205, 239-41, 44.)[5]

On May 17, 2005, Plaintiff filed pro se claims for Disability Insurance Benefits and Supplemental Security Income Benefits beginning July 13, 1998. On July 15, 2005, in connection

---

[5] Plaintiff also began complaining of eye problems in late 2005. (*Id.* at 188-91.) But neither party appears to place weight on this condition for purposes of Plaintiff's appeal.

with his claims, Plaintiff was independently examined by Daniel Edelman, Psy.D. (*Id.* at 162.) Plaintiff reported symptoms of depression marked by dysphoric moods, psychomotor retardation, crying spells, hopelessness, loss of usual interests, irritability, diminished self-esteem, concentration difficulties, a diminished sense of pleasure, and withdrawal, but suggested that he was not suicidal. (*Id.* at 163.) At that time, Plaintiff was still proscribed 100 milligrams of Zolof. (*Id.*) He was also taking 50 milligrams of Trazodone. (*Id.*) Dr. Edelman noted that Plaintiff "was cooperative, with adequate social skills." (*Id.*) His thought process was "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the evaluation setting." (*Id.*) Plaintiff could also "follow and understand simple directions and instructions and perform simple tasks independently." (*Id.* at 163.) And he could learn new tasks and "make appropriate decisions." (*Id.* at 165.) However, Dr. Edelman did note that, among other things, Plaintiff's affect was dysphoric, his mood was dysthymic, his attention and concentration were "mildly impaired," he had poor housekeeping and money management habits, and could not maintain a regular schedule. (*Id.*) At the time, Plaintiff's day consisted of drinking coffee, walking outside, watching the news, and taking naps. (*Id.*) Dr. Edelman offered the following medical source statement:

> Claimant can follow and understand simple directions and instructions and perform simple tasks independently. He generally can maintain attention and concentration. He cannot presently maintain a regular schedule. He can learn new tasks. He would have difficulty at present with complex tasks. He can make appropriate decisions. He cannot at present relate adequately with others or appropriately deal with stress. Difficulties are caused by symptoms of depression.

(*Id.*) Finally, Dr. Edelman offered the following prognosis: "[g]uarded, given the severity of [Plaintiff]s depression and the extent of his social isolation, notwithstanding good family support."

(*Id.* at 166.)

On February 9, 2006, Plaintiff underwent physical and psychological consultive exams by Justin Fernando, M.D. and Jan S. Cavanaugh, Ph.D., respectively. During this time, Plaintiff was taking the following proscriptions: 150 milligrams of Zoloft; 12.5 milligrams of Ambien; 50 milligrams of Toprol XL; and 10 milligrams of Midodrine. (*Id.* at 240, 245.) As expected, Dr. Fernando diagnosed Plaintiff with a history of recurrent syncope and profound bradycardia. (*Id.* at 248.) However, Dr. Fernando also noted that Plaintiff was not in acute distress, his gait was normal, he could walk on heels and toes without difficulty, his stance was normal, and he was able to rise from a chair without difficulty. (*Id.* at 246.) Accordingly, Dr. Fernando stated in his medical source statement and Plaintiff had "[n]o objective limitations," and his prognosis was "good." (*Id.* at 243.)

That same day, Dr. Cavanaugh reported that Plaintiff's demeanor and responsiveness to questions was cooperative and his social skills were adequate. (*Id.* at 240.) Plaintiff's thought process was coherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the evaluation setting. (*Id.* at 241.) His affect was depressed and flat, his mood was dysthymic, his concentration was mildly impaired, and his judgement was fair. (*Id.*) Dr. Cavanaugh offered the following medical source statement regarding Plaintiff's ability to work:

> Vocationally, the claimant is able to follow and understand simple directions and instructions. He can perform simple tasks independently. He has some limits in maintaining attention and concentration. He has some limits in being able to maintain a regular schedule without physical support. He has some limits in learning new tasks. He has some limits in performing complex tasks without help. he can make appropriate decisions. He can relate adequately with others, but is choosing to isolate at this time. He has some limits in dealing appropriately with his stress. Vocational difficulties appear to be caused by a combination of medical and psychological issues.

(*Id.* at 242.) Like Dr. Edelman, Dr. Cavanaugh's prognosis was "[g]uarded, pending treatment and further evaulation of Plaintiff's medical issues." (*Id.* at 243.) Yet, Dr. Cavanaugh also noted that "[i]t was hoped that with ongoing treatment and support [Plaintiff] will achieve a higher quality of functioning." (*Id.*) In contrast to Dr. Edelman, Dr. Cavanaugh also concluded that Plaintiff was able to manage his own funds. (*Id.* at 166.)

On February 22, 2006, Plaintiff's disability claims were denied. On April 25, 2006, with the assistance of counsel, Plaintiff filed a timely request for an administrative hearing. (*Id.* at 76.)[6] On August 28, 2007, a hearing was held before Administrative Law Judge Richard L. De Steno ("ALJ"). The hearing consisted of argument from Plaintiff's counsel and the testimony of Plaintiff. (*Id.* at 14.)

On September 28, 2007, the ALJ denied Plaintiff's claim for Disability Insurance Benefits and Supplemental Security Income Benefits for the period July 13, 1998 to May 16, 2005. As explained below, the ALJ utilized a "five-step sequential evaluation process" promulgated by the Social Security Administration to determine disability. 20 C.F.R. § 404.1520(a)(4). At the second step of this process the ALJ found -- without the benefit of expert testimony -- that Plaintiff did not have a severe impairment, only "suffer[ing] from some depression for [a] duration of less than twelve months prior to the date he was last insured, December 31, 2003. (*Id.* at 16.) However, the ALJ did find that Plaintiff was disabled as of May 17, 2005 (the date he filed his disability claims) with "severe impairments involving syncope and depression." (*Id.* at 21.) In that regard, the ALJ found that Plaintiff had the residual functional capacity to perform a full range of work at all exertion

---

[6] As noted by the ALJ, while Plaintiff's disability appeal was ongoing, he continued treatment for depression and near syncope. On March 26, 2006, Marvin A. Rubinstein, M.D., concluded that Plaintiff is "completely disabled" based upon "multiple episodes of near syncope" and "significant depression." (*Id.* at 308.)

levels, but had significant non-exertional limitations due to his depression, which prevent him from performing past relevant work. (*Id.* at 22-23.) Furthermore, the ALJ concluded that Plaintiff's non-exertional limitations mean there are "not a significant number of jobs in the national economy" for Plaintiff. (*Id.* at 23-24.) Accordingly, the ALJ concluded that Plaintiff was eligible to receive Supplemental Security Income as of May 17, 2005. (*Id.* at 24.)

On April 17, 2009, the Social Security Administration's Appeals Council found no grounds to overrule the ALJ's decision, constituting the Commissioner's final decision. *See* 42 U.S.C. § 405(g). Having exhausted his administrative remedies, Plaintiff now appeals the Commissioner's final decision because, Plaintiff argues, he was disabled prior to the date last insured, December 31, 2003.

## II. STANDARD OF REVIEW

A district court's review of the Commission's final decision denying disability benefits is not plenary. *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir.2000). A court is "bound to the Commission's findings of fact if they are supported by substantial evidence in the record." *Id.*; 42 U.S.C. § 405(g); *see also Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (A district court should "not set the Commissioner's decision aside if it is supported by substantial evidence, even if we would have decided the factual inquiry differently."). "Substantial evidence is defined as more than a scintilla. It means such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Morales*, 225 F.3d at 316 (internal quotations omitted). When faced with conflicting evidence, however, the Commissioner "must adequately explain in the record his reasons for rejecting or discrediting competent evidence." *Sykes v. Apfel*, 228 F.3d 259, 266 n.9 (3d Cir. 2000) (internal quotations omitted).

In determining whether there is substantial evidence in the record, a court must view the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir.1984). "A single piece of evidence will not satisfy the substantiality test if the Commissioner ignores, or fails to resolve, a conflict created by counterveiling evidence." *Morales*, 225 F.3d at 316 (internal quotations omitted) (alterations omitted). "Nor is evidence substantial if it is overwhelmed by other evidence -- particularly certain types of evidence (e.g., that offered by treating physicians) -- or if it really constitutes not evidence but mere conclusion." *Id.*

### III.   DISCUSSION

In order to obtain Disability Insurance Benefits, a claimant must satisfy the insured status requirements of 42 U.S.C. § 423(c) and qualify as "disabled." 42 U.S.C. § 423(a). A claimant is "disabled" if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant's physical or mental impairment or impairments much be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In order to determine disability under the Act, the Social Security Administration has promulgated a "five-step sequential evaluation process." 20 C.F.R. § 404.1520(a)(4). "At steps one through four, the burden of proof is on the claimant whereas at step five the burden of proof shifts to the Commissioner." *Shea v. Massanari*, 32 F. App'x 632, 633 (3d Cir. 2002) (citing 20 C.F.R. § 404.1520(f)). First, a claimant must establish that he is not currently engaging in "substantial

gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). Second, a claimant must demonstrate a "severe medically determinable physical or mental impairment . . . or a combination of impairments that is severe and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(ii). Third, the Commission considers whether the impairment "meets or equals" an impairment listed in 20 C.F.R. § 404, Subpart P, App'x; for example, growth impairment, mental disorders, immune systems disorders, etc. 20 C.F.R. § 404.1520(a)(4)(ii). Fourth, a claimant must show that he cannot perform "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv). This determination is made by further considering the following: (1) the claimant's residual functional capacity; (2) the physical and mental demands of the claimant's past relevant work; and (3) a comparison of residual functional capacity and the level of capability needed to perform the past relevant work. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000). Finally, at the fifth step, the burden shifts to the Commissioner to determine whether there is any other work in the national economy that a claimant can perform. If the Commissioner cannot satisfy this burden, a claimant shall receive disability benefits. *See* C.F.R. § 404.1520(g). To determine whether there exist employment in the national economy that a claimant can perform, the Commissioner can utilize a "medical-vocational 'grid'" located at 20 C.F.R. § 404, Subpart P, App'x 2, which considers age, physical ability, and education and work experience. However, "[t]he regulations still require an individualized hearing in which the claimant has an opportunity to present evidence regarding his particular disabilities; the grids only apply to an issue that is not unique to each claimant-the types and numbers of jobs that exist in the national economy." *Sykes*, 228 F.3d at 69-70 (internal quotations omitted).

The Commissioner's final decision -- that Plaintiff is disabled as of May 17, 2005 -- is not supported by substantial evidence. In making his decision, the ALJ assumed that Plaintiff did not

11

seek treatment from February 10, 1997 to September 23, 2004 because his condition had improved. (*See* R. 18.) However, contrary to the ALJ's assumption, Plaintiff testified that he remained depressed and was homeless for a period of approximately six months during that time. (*Id.* 42-43.) Indeed, when Plaintiff returned to treatment in 2004 at the prompting of his mother, he was diagnosed by Dr. Banasiak as having a major depressive disorder, recurrent. (*Id.* at 176.) Plaintiff also reported having hypersomnia, difficulty falling asleep, interrupted sleep, crying, fatigue, loss of interest in usual activities, feelings of hopelessness, episodic anxiety, and irritability for "the past eight years." (*Id.* at 174.) Moreover, as the Third Circuit has noted, simply because Plaintiff did not seek medical treatment does not mean he was not depressed. *See Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 547 (3d Cir. 2003). "[S]everal courts have questioned the relevance of infrequent medical visits in determining when or whether a claimant is disabled." *Id.* Thus, Plaintiff's testimony should have been considered in determining the appropriate onset date for his condition.

Lastly, there is no explanation as to why May 17, 2005 was selected as to date of disability. Accordingly, Plaintiff's case is remanded to the Commissioner for further consideration of the exact onset date for Plaintiff's disability. In making his additional findings in light of Plaintiff's testimony at the prior hearing, the ALJ may choose to consider expert testimony, particularly in light of the uncertainty and extended period of time in which Plaintiff's condition developed. "[A]n ALJ should call on the services of a medical advisor when he or she must infer the onset date of an impairment that is not clear from the applicant's medical records. This requirement is particularly important where the impairment at issue becomes progressively worse over an extended period of time." *Jakubowski v. Comm'r of Soc. Sec.*, 215 F. App'x 104, 108 (3d Cir. 2007).

## IV. CONCLUSION

For the foregoing reasons, this matter is remanded to the Commissioner for further consideration in accordance with this opinion.

_____
HON. PETER G. SHERIDAN, U.S.D.J.

Dated: August 11, 2010